UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JONATHAN JOSEPH GOOD,

            Plaintiff,           Case No. 2:19-cv-222

v.                                      Honorable Paul L. Maloney

SCOTT GOODELL et al.,

            Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Kagey and Washington.

## Discussion

**I.    Factual Allegations**

Plaintiff presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan.

The events about which he complains occurred at that facility.  Plaintiff sues MDOC Director Heidi Washington and the following KCF officials:  Correctional Officer Scott Goodell; Sergeant (unknown) Kagey; and Prisoner Counselor Wallace Maclean.  Defendants are sued solely in their personal capacities.

Plaintiff was notified on June 25, 2017, that he was scheduled to have an angioplasty on June 28, 2017, and that he would be sent out to the Marquette Branch Prison (MBP) to await the procedure at the Marquette General Hospital.  Before the transfer, on June 25, 2017, Officer Depky came to Plaintiff's bunk to tell him to pack his property.  Plaintiff complained, stating that other prisoners merely locked their property in their lockers rather than packing them for storage in the property room.  Officer Depky's partner called for assistance, stating that Plaintiff did not want to pack his property.  Other officers arrived, including Defendant Goodell and a sergeant.

The sergeant asked why Plaintiff did not want to have his property taken to the property room.  Plaintiff explained that he believed his property would be safer in the locker than with Defendant Goodell in the property room.  Defendant Goodell overheard this explanation.  The sergeant ultimately concluded that Plaintiff was not causing a problem and could keep his property in his bunk area.

At approximately 12:30 the next morning, Plaintiff was awakened by three officers and told to report to Lieutenant Tonight (not a Defendant).  Lt. Tonight told Plaintiff to pack his property immediately.  Plaintiff protested but complied.  Plaintiff took his packed property to the officers who were waiting in the unit dayroom.  Plaintiff was then ordered to leave while the officers itemized and packed out of Plaintiff's presence.  Plaintiff objected but, after being given a direct order, complied.

2

At 4:00 a.m., Plaintiff again was awakened and told that he was being transferred out of the prison. Unknown officers gave him completed pack-up forms, including contraband removal forms. Plaintiff asked where his property was and whether it would follow him. He was told that his property would be secured in the property room.

Plaintiff was transferred to MBP on June 26, 2017, and he went to Marquette General Hospital on June 28, 2017. Plaintiff underwent an attempted angioplasty, which was aborted for medical reasons. Plaintiff was placed in the intensive care unit (ICU) and later on the secured ward. On July 3, 2017, Plaintiff underwent triple bypass surgery. He awoke on July 5, 2017, and thereafter actively pursued his rehabilitation process. On July 9, 2017, Plaintiff was placed in a rehabilitation unit at MBP, known as the Brooks Center.

During the time preceding his bypass surgery and thereafter, Plaintiff repeatedly requested his property and inquired about its location, advising officials of his pending deadline for filing objections to a report and recommendation (R&R) of the magistrate judge in a case in the Eastern District of Michigan. *See Good v. Heyns et al.*, No. 2:15-cv-12064 (E.D. Mich.) (ECF No. 77 (allowing 14 days from May 25, 2017, to file objections); text order June 21, 2017 (granting extension of time to file objections until July 24, 2017)). Plaintiff was not allowed pen or paper while in the Brooks Center, and he was advised by staff that he might remain there for six months or more. On July 15 or 16, 2017, Plaintiff began telling medical staff that he would sign off on further treatment at the Brooks Center so that he could return to KCF, where he could access his property.

On July 17, 2017, Plaintiff received legal mail that had been forwarded from KCF to MBP after a one-month delay. The mail advised Plaintiff that his motion for extension of time had been granted, and he had until July 24, 2017, to file his objections.

3

On July 19, 2017, Plaintiff learned that he was to be transferred to KCF. During a health check on arrival at KCF, Plaintiff learned that his chest wound had torn open and was bleeding as a result of the bumpy ride. Plaintiff was placed in a bottom bunk and given the other items he had received at the Brooks Center. He was assigned to a different unit than he had occupied before surgery. Shortly thereafter, Plaintiff was called to the property room to get his property. When he arrived, he was given only one duffle bag, a television box, and a typewriter box. Plaintiff immediately objected, advising Defendant Goodell and two other officers that he needed access to his legal materials to meet a July 24, 2017, deadline. Defendant Goodell responded that he had taken Plaintiff's excess legal property on a notice of intent (NOI), which had long since been subjected to a notice-of-intent hearing.

After Plaintiff returned to his cell with his property, he discovered that Defendant Goodell had removed all of Plaintiff's photographs, personal letters, paperwork, envelopes, pens, typewriter paper, and ribbons from Plaintiff's personal property. On July 19, 20, and 21, 2017, Plaintiff submitted requests for access to his legal property. He received no response to the requests, and supervisory staff refused to intervene. Plaintiff authored grievances against Defendant Goodell on July 23 and 24, 2017, based on the impounding of his legal materials and the refusal to allow access.

On July 25, 2017, Plaintiff was called to Defendant Maclean's office, where he was advised that the grievance investigator was scheduled for 1:00 p.m., at which time Plaintiff and Maclean were to report to the property room to inventory the property being held by Defendant Goodell. Before Plaintiff could leave the office, Defendant Maclean reviewed Plaintiff on one of the NOIs issued by Defendant Goodell. Plaintiff objected to the delay in the NOI review.

At 1:00 p.m., Plaintiff and Maclean met at Maclean's office and walked to the property room to itemize the materials Defendant Goodell had thrown into four duffle bags. Plaintiff began to remove and categorize items into legal and personal property. Once the first bag was roughly categorized, the duffle bag was refilled and taken to the office of the hearing investigator. Plaintiff was not allowed to identify which legal items were in each bag or to label the bags. Plaintiff returned to his cell with his personal property.

A short time later, Plaintiff was called back to Maclean's office, where he was presented with the NOI for the impounded legal materials, to which Maclean had attached the itemized list. Defendant Maclean attempted to retrieve the original NOI from Plaintiff, but Plaintiff balked, indicating that Defendant Goodell's NOI was evidence of Plaintiff's denial of access to the courts and retaliation. Defendant Maclean then conducted a hearing on the second NOI, which referred to a number of grievances written by another prisoner that were in Plaintiff's possession. Defendant Maclean ordered those grievances destroyed.

When Plaintiff returned to his bunk, he prepared two grievances against Defendant Goodell: one alleging denial of access to the courts and one alleging retaliation. On July 26, grievance coordinator C. Anderson (not a Defendant) called Plaintiff to the office, informing Plaintiff that he was wasting his time filing grievances against Defendant Goodell, as they would be rejected. Plaintiff asked if Anderson intended to disregard grievance policy and to act in concert with Defendant Goodell. Anderson reiterated that he did not care and told Plaintiff to leave.

On July 27, 2017, Hearings Officer O'Brien conducted a hearing on the NOI respecting Plaintiff's legal property. After examination and review, O'Brien ordered that all legal materials in the duffle bags be returned to Plaintiff. Plaintiff returned to his unit with his legal work and took it to his cube. Shortly thereafter, Defendant Maclean ordered Plaintiff to return the

5

duffle bags to the property room, as excess legal property was not allowed in the unit. When Plaintiff explained that the hearings officer had ordered that Plaintiff be given the materials, Defendant Maclean repeated his order. When Maclean left, Correctional Officer Wallace gave Plaintiff five minutes to go through the bags to find the materials he needed for his case deadline. As Plaintiff was looking through a bag, Defendant Maclean entered the day room and ordered Plaintiff to take the duffle bags to the property room immediately. Plaintiff was allowed to keep one bag, and he hoped that he had chosen the right one, but he guessed wrong.

Defendant Goodell was waiting at the property room when Plaintiff arrived with his excess legal property. Plaintiff explained that he needed to access his duffle bags. Defendant Goodell responded sarcastically that Plaintiff should submit a kite.

Defendant Kagey reviewed Plaintiff's grievance against Defendant Goodell for withholding legal materials. Defendant Kagey denied the grievance, finding good reason for the failure of Plaintiff's property to be forwarded during his medical transfer and concluding that Plaintiff could now have access to his excess legal property if he sent a kite to the property officer. Plaintiff contends that, in denying the grievance, Defendant Kagey was engaging in concerted action with Defendant Goodell to deny Plaintiff his legal materials.

Plaintiff's civil action was dismissed on August 10, 2017. Plaintiff alleges that he sent kites requesting access to his legal materials on August 11, 14, and 17, 2017. When he received no response to the kites, he filed another grievance.

In Count I of his complaint, Plaintiff contends that Defendants' actions to deny him access to his legal materials denied him access to the courts by preventing Plaintiff from filing objections to the R&R, resulting in the dismissal of Plaintiff's nonfrivolous legal action.[1]

---

[1] Plaintiff alleges the underlying facts of the dismissed action. If true, the underlying complaint alleged a retaliation claim against an officer for filing a false Class-II misconduct charge. The magistrate judge recommended dismissal

In Count II, Plaintiff argues that Defendants Maclean and Goodell took part in a conspiracy to deprive Plaintiff of his right of access to the courts. Plaintiff also contends that Maclean conspired with Goodell to require Plaintiff to purchase footlockers, as his property was required to be kept in footlockers, rather than duffle bags. Plaintiff complained that the policy reading was incorrect but complied and purchased the footlockers. When the footlockers arrived on August 28, 2019, Maclean directed Plaintiff to go to the property room, get his legal materials, put the materials in footlockers, and return two of the footlockers to the property room. Plaintiff again complained that Maclean's application of the policy was incorrect, as Plaintiff could keep as many legal footlockers as he wanted, as long as the unit had sufficient storage space. *See* Mich. Dep't of Corr. Policy Directive (PD) 04.07.112. Defendant Maclean disagreed. Plaintiff also complains that Defendant Washington is liable for creating a policy that permits arbitrary determinations that interfere with the exercise of First Amendment rights.

In Count III of the complaint, Plaintiff alleges that Defendant Goodell deprived Plaintiff of his legal property in retaliation for Plaintiff having assisted Prisoner V. White to prepare a request for a declaratory ruling against Defendant Goodell. He also alleges that Defendant Goodell retaliated against Plaintiff for Plaintiff's spoken complaints to Goodell's supervisor, indicating that Plaintiff did not wish to store his property in the property room, because he believed that Goodell would damage or destroy it. Plaintiff further alleges that Defendant Goodell's actions were taken in retaliation for Plaintiff having filed two lawsuits against MDOC employees, both of which Defendant Goodell had seen when he searched Plaintiff's legal materials. Plaintiff alleges that Defendant Kagey retaliated against Plaintiff by denying a grievance against Defendant Goodell, thereby covering up Defendant Goodell's failures to allow

---

on the ground of qualified immunity, concluding that it was not clearly established that two days' loss of privileges constituted adverse action. (Compl., ECF No. 1, PageID.18-19.)

7

Plaintiff to access his legal property. Plaintiff alleges that Defendant Maclean retaliated against him for filing grievances by sharing his opinion with the KCF electrical maintenance supervisor that Plaintiff "was a prisoner who like to tell staff what to do . . . ," thereby causing Plaintiff to be passed over for job openings as an electrician. (*Id.*, PageID.34.)

In Count IV, Plaintiff contends that he wrote a grievance against Defendant Goodell on August 6, 2017, in which he complained that Defendant Goodell had singled Plaintiff out for harassment because of the grievances Plaintiff had written. Plaintiff alleges that Defendant Goodell sneaked up on Plaintiff when he was writing the grievance, read the grievance over Plaintiff's shoulder, and immediately authored a misconduct ticket charging Plaintiff for entering the chow hall when he had no authorized purpose there, since he had a medical detail to receive a special medical low-sodium diet. Plaintiff was found not guilty of the misconduct because, while he should have been receiving a special-diet callout, he was not. Plaintiff was found to have acted in accordance with the rules to the best of his ability.

In the fifth count of his complaint, Plaintiff alleges that Defendants Kagey and Goodell agreed to advance a plan of retaliation to "get[] back at" Plaintiff. (*Id.*, PageID.39.) Defendant Goodell engaged in repeated efforts to keep Plaintiff from accessing his property between June 25, 2017, and late August 2017. Defendant Goodell also allegedly filed false misconduct tickets against Plaintiff. Defendant Kagey allegedly participated in the plan by denying Plaintiff's grievances.

For relief, Plaintiff seeks compensatory and punitive damages, together with injunctive relief from Defendant Washington barring the impounding of legal materials under PD 04.07.112.

## II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

9

identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III. Defendant Kagey

Plaintiff alleges that Defendant Kagey conspired with Defendant Goodell, to retaliate against Plaintiff, deny Plaintiff access to the courts, and deny Plaintiff due process—all by denying Plaintiff's grievances. Plaintiff alleges no facts supporting his claims against Kagey other than the fact of Kagey's decisions on Plaintiff's grievances. Reading the complaint with all due liberality, Plaintiff arguably implies that Defendant Kagey, as a sergeant, was responsible for the acts of his subordinate, Defendant Correctional Officer Goodell.

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations of conspiracy are wholly conclusory and speculative. Plaintiff has provided no factual allegations establishing a link between Defendant Kagey and Defendants Goodall and Maclean or any agreement between them. As the Supreme Court has

10

held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680.

As a result, Plaintiff's claim against Defendant Kagey rests on an assumption that Defendant Kagey was responsible for overseeing Defendant Goodell or because Kagey denied Plaintiff's grievances. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendant Kagey engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against Defendant Kagey.

### IV. Defendant Washington

Plaintiff suggests that Defendant Washington both failed to supervise her subordinates and imposed and maintained a policy that could be interpreted to allow prison officials to deprive prisoners of their property in a way that denies prisoners access to the courts. He seeks an injunction barring any policy that allows legal materials to be impounded in any way that delays a prisoner from accessing them.

To the extent that Plaintiff seeks to hold Defendant Washington liable for the unconstitutional conduct of the other Defendants, he fails to state a claim for the reasons discussed in relation to Defendant Kagey—Plaintiff alleges no active conduct by Defendant Washington in relation to the specific deprivations allegedly committed by Defendants Goodell and Maclean. As discussed, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S. at 691; *Everson*, 556 F.3d at 495. A claimed constitutional violation must be based upon active unconstitutional behavior. *Iqbal*, 556 U.S. at 676; *Grinter*, 532 F.3d at 575-76; *Greene*, 310 F.3d at 899. Plaintiff fails to allege that Defendant Washington engaged in any active unconstitutional behavior related to the alleged improper impounding of Plaintiff's legal materials.

Plaintiff also seeks to hold Defendant Washington liable for creating and/or maintaining that part of PD 04.07.112 that permits the impounding of legal materials if they are deemed to be excessive. He seeks to enjoin Defendant Washington "from creating or enacting any policy provision which can be arbitrarily used to infringe, hinder, or otherwise prohibit[s] immediate access to Plaintiff's legal materials." (Compl., ECF No. 1, PageID.40.)

Plaintiff appears to complain about PD 04.07.112 ¶ P, which provides as follows:

> If the prisoner's property exceeds allowable limits due to items claimed to be legal property, a hearing shall be conducted by a hearing officer from the Department of Licensing and Regulatory Affairs to determine if the items are legal property and

12

>thus allowed to be possessed. Prisoners who have allowable excess legal property are required to store the property in footlockers designated for that purpose, which shall be purchased by the prisoner. A prisoner who lacks sufficient funds to purchase the footlocker shall be loaned the necessary funds; loaned funds shall be treated as an institutional debt. A prisoner who was loaned a fire-resistant Cortex container or a footlocker to store allowable excess legal property prior to the effective date of this policy may be permitted to keep it in lieu of purchasing a footlocker until the prisoner transfers to another facility. A prisoner who has more than one footlocker designated for legal property may be required to store excess footlockers in an area designated by the Warden if the Warden determines there is insufficient storage space in the prisoner's cell, room, or other housing area (e.g., bay). Upon request, a prisoner shall be provided reasonable access to their stored footlockers within two calendar days of staff receipt of the request. The prisoner also shall be allowed to exchange legal property in the stored footlockers for legal property stored in their possession.

*Id.*

Plaintiff's argument fails for multiple reasons. First, to the extent that Plaintiff claims that any interference or delay in a prisoner's access to his legal property deprives the prisoner of access to the courts, his claim is without merit. A prisoner's constitutional right to legal resources and materials for purposes of accessing the courts is not unlimited. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop v. Johnson*, 977 F.2d 996, 1000 (6th Cir. 1992). In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

>*Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

13

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

As a result, unless an excess-legal-property policy actually hinders a prisoner from pursuing the types of claims protected by the right, the restriction does not violate a prisoner's right to access to the courts; the right to access the courts does not bar a prison policy that temporarily restricts a prisoner's access to his legal materials unless actual injury exists. Here, the policy in issue makes express provision for prison officials to provide prompt access to stored legal materials, upon request. As written, therefore, the policy allows a prisoner to access his stored excess legal materials to prevent interference with the right to access the courts. The fact that a prison official misapplies policy or intentionally refuses to allow a prisoner to access legal materials in a way that interferes with a prisoner's ability to access the courts may result in a claim against that official. But no access-to-the-courts claim arises from the policy itself.

Moreover, Plaintiff cannot demonstrate that the policy in issue violates his right to due process. "The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis (Bazzetta II)*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claims involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second

14

examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225. In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when a prison restriction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson*, 545 U.S. at 222-23.

Plaintiff does not allege that the policy allowing impoundment of some of his legal materials will inevitably affect the duration of his sentence. He instead suggests that any policy that delays his access to his excess legal property is of sufficient significance to be protected by the Due Process Clause.

As discussed, the challenged policy permits a prisoner to keep in his cell one approved footlocker containing legal material. Any excess legal material is stored in the property room, and prisoners have a right to access that property within two days of request. In addition, prisoners have the right to exchange the legal property in their cells for legal property held in the property room.

Courts routinely have recognized such restrictions and have concluded that prisoners do not have a constitutional right to maintain an unlimited amount of property in their cells. *See Friend v. Chapleau*, No. 95-5628, 1995 WL 607835, at *2 (6th Cir. Oct. 13, 1995) (holding that the defendant did not have a constitutional right to possess unlimited amounts of legal property); *see also Smith v. Ortiz*, No. 05-1211, 2006 WL 620871, at *2 (10th Cir. Mar. 14, 2006) (recognizing the distinction between the right to own property and the right to possess it while in prison and holding that, when a prisoner was allowed to send his property to another location, he was not deprived of property); *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) ("The regulation of type and quantity of individual possession in cells is typical of the kinds of prison conditions that the Court has declared to be subject to the . . . analysis set forth in *Sandin*."); *see also Hinds v. Lewis*, No. 1:19-cv-279, 2019 WL 2223253, at *5 (W.D. Mich. May 23, 2019) (recognizing that a prisoner has no right to possess unlimited property in his cell); *Blanton v. Caruso*, No. 1:10-cv-1187, 2011 WL 202094, at *3 (W.D. Mich. Jan. 19, 2011) (limitation on in-cell property is not atypical and significant).

Because Plaintiff has no property interest in keeping all of his legal materials in his cell, the policy to which he objects does not deprive him of due process.

Even if Plaintiff had a due process interest in immediate access to his excess legal property, the limitations on that right imposed by the policy are constitutional. While inmates retain constitutional rights consistent with their imprisonment, prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess an official's actions by reference to the following factors: (1) whether there exists a valid, rational

connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *Turner*, 482 U.S. at 89-90.

The policy in issue expressly states the reason for restrictions on in-cell property: "Excessive prisoner property in housing units constitutes a fire hazard and creates sanitation, housekeeping, and security concerns." PD 04.07.112 Policy Statement. Other courts have recognized as legitimate similar penological interests in limiting the amount and kind of property stored in prisoner cells.

> Security concerns demand the regular search of inmate cells and an unlimited amount of . . . property items would place an excessive burden on staff when conducting such searches. Property-related security concerns include theft, bartering, misuse of property to fashion weapons, using property to hide contraband, and utilizing property to signify gang affiliation. Additionally, health and safety concerns arise from allowing cluttered cells, which can lead to unsanitary conditions and possible fire hazards. *See Joseph v. Campbell*, 10 F. App'x 264 (6th Cir. 2001) (holding that the restriction on inmates' use of oils was rationally related to a legitimate penological interest in security because oils are flammable and could be used to mask the odor of drugs, and not in violation of the First Amendment because inmates had an alternative means of using oils through religious volunteers visiting the prison.)

*Abdullah v. Anderson*, No. 5:05-cv-568, 2008 WL 4103980, at *13 (S.D. W. Va. Sept. 2, 2008) (discussing limitation on in-cell property, despite declared desire to use property for religious purposes); *see also Bell v. Wolfish*, 441 U.S. 520, 553 (1979) (recognizing legitimate governmental interests in restricting total property for storage and sanitation reasons and potential theft); *Dearing v. Weaks*, No. 18-4173, 2019 WL 6464017, at *3 (6th Cir. July 15, 2019) (upholding legitimate interest in restricting certain property to limit, inter alia, "'[t]he potential to start a fire in a cell, flood toilets, or other destruction of institutional property[.]'" (quoting Oh. Dep't of Rehab. &

17

Corr. Policy 61-PRP-01(VI)(A)(9))); *Simpson v. Director*, No. 4:15cv644, 2017 WL 1022783, at *2-3 (5th Cir. Mar. 16, 2017) (holding that prison policy of restricting storage space for legal and religious property was reasonably related to legitimate penological purpose of maintaining prison security); *Ford v. Schmidt*, 577 F.2d 408, 410 (7th Cir. 1978) ("[P]rison officials may, as a condition of confinement, establish rules and regulations concerning the possession of property by inmates."); *Koger v. Dart*, No. 14 C 6361, 2019 WL 4261201, at *8 (N.D. Ill. Sept. 9, 2019) (addressing legitimate penological interests in in limiting written materials for safety and security, sanitation, and ease of searches); *Garrett v. Gilmore*, 926 F. Supp. 554, 557 (W.D. Va. 1996) (finding legitimate penological interest in fire safety and accessibility in limiting personal property), *aff'd* 103 F.3d 117 (4th Cir. 1996).

In addition, the policy at issue leaves prisoners with ample alternative means of exercising their right to possess property. As discussed, under the policy, prisoners are allowed to keep one authorized footlocker of legal materials in their cells, to trade out legal materials in their cells with those in the property room, and to request legal materials and receive them within two days. Such alternatives places little burden on the prisoner's possession of his property.

Further, Plaintiff's request that prison policy place no limits or restrictions on the amount of legal property that a prisoner may maintain in his cell would wholly undercut any ability for the prison to maintain order and sanitation and would prevent officers from performing routine searches efficiently, given the amount of paper they would have to review to find contraband.

Finally, in light of Plaintiff's blanket demand to keep unlimited legal property, no readily apparent alternatives would fully accommodate his asserted right at a de minimis cost to officials and the institution.

In sum, Plaintiff's allegations against Defendant Washington fail to state a claim. Plaintiff's allegations fail to show that Defendant Washington participated in the denial of access to the courts alleged against Defendants Goodell and Maclean. Moreover, Plaintiff utterly fails to show that the excess-legal-property policy maintained by Defendant Washington, on its face, violates any constitutional right. For both reasons, Plaintiff's claims against Defendant Washington will be dismissed for failure to state a claim.

## V. Defendants Goodell & Maclean

Upon initial review, the Court concludes that Plaintiff's allegations are sufficient to state a claim against Defendants Goodell and Maclean.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Kagey and Washington will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's claims against Defendants Goodell and Maclean remain in the case.

An order consistent with this opinion will be entered.

Dated:   February 24, 2020                         /s/ Paul L. Maloney
                                                  Paul L. Maloney
                                                  United States District Judge